Charles B. Wolf v. Commissioner.Wolf v. CommissionerDocket Nos. 16887, 17169.United States Tax Court1949 Tax Ct. Memo LEXIS 47; 8 T.C.M. (CCH) 949; T.C.M. (RIA) 49256; October 14, 1949*47 1. Upon the facts of record it is held that petitioner, his wife and his daughter were partners in an enterprise known as Alloy Rods Company, each owning a 1/17th interest therein. 2. Respondent's action in using the original cost of machinery and equipment as the basis for depreciation approved in the absence of proof to the contrary. 3. Respondent's holding that payments of so-called debenture notes resulted in income approved for lack of proof of error. 4. In computing his 1944 surtax, petitioner is entitled to credits for his two daughters as statutory dependents. 5. Petitioner is not entitled to a deduction of $5,200.58 in 1944 as a bad debt due from J. Ross Grove or as a loss in a transaction entered into for profit. *48 Andrew B. Young, Esq., and David P. Brown, Jr., Esq., Real Estate Trust Bldg., Philadelphia, Pa., for the petitioner. Karl W. Windhorst, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion In Docket No. 16887 the respondent determined a deficiency of $14,600.21 in the petitioner's income tax liability for the year 1944. In Docket No. 17169 he determined deficiencies of $19,794.36 and $51,947.82 in the petitioner's income tax liability for the years 1941 and 1943, respectively. The issues are: 1. Did the partnership known as Alloy Rods Company constitute a bona fide and real partnership for Federal income tax purposes and hence is the petitioner taxable on 1/17th of the partnership income, representing his own share thereof as provided in the Articles of Partnership, or is he taxable on 3/17ths of such income representing the shares of himself, his wife and his daughter? 2. The proper basis for depreciation of certain equipment and machinery owned by the Alloy Rods Company and acquired by it from the stockholders of Alloy Rods Corporation. 3. Were certain alleged payments of debenture notes to the stockholders of the Alloy Rods Corporation*49 taxable as ordinary income? 4. In computing his 1944 surtax is the petitioner entitled to credits for his daughters Jessie C. Wolf and Mary Julia Wolf as statutory dependents? 5. Is the petitioner entitled to a deduction of $5,200.58 in 1944 as a bad debt due from J. Ross Grove, or as a loss on a transaction entered into for profit? 6. Did the respondent erroneously charge the petitioner with renegotiation credits of $38,157.46 and $12,260.51 allowed for the years 1943 and 1944, respectively? This issue was settled at the trial by the petitioner's concession that the respondent's adjustments were correct. Findings of Fact Certain facts were stipulated. * They relate to the issues common to the cases at bar and to the Himes cases. Insofar as material to the issues they are as follows: The petitioner resides at Mount Wolf, York, Pennsylvania. He filed his income tax returns for the taxable years with the collector of internal revenue for the first district of Pennsylvania. During the year 1939, the petitioner, William D. Himes and certain other individuals became associated in an enterprise engaged in the production of welding rods and other articles and operated under the*50 name of Alloy Rods. The following checks were drawn on York Trust Company, to the order of Alloy Rods, or to the order of Alloy Rods Corporation, as indicated below, and on the dates and in the amounts indicated: Alloy RodsAlloyDateCorporationRodsGrace T. Himes2- 3-40$ 500Grace T. Himes2-20-40500Grace T. Himes2-25-40500Grace T. Himes3- 8-401,000Grace T. Himes3-18-40500Grace T. Himes3-26-401,000Grace T. Himes4-18-40250Grace T. Himes4-22-40250Charles B. Wolf1-29-40 $500Charles B. Wolf2-26-40500Charles B. Wolf4-19-40500Oscar H. Heckert2- 1-40500Oscar H. Heckert2-16-40500Oscar H. Heckert2-26-40500Oscar H. Heckert3- 7-40500Oscar H. Heckert3- 8-401,000Oscar H. Heckert3- 8-401,000Oscar H. Heckert3-16-40500Oscar H. Heckert3-16-40500Oscar H. Heckert3-25-401,000Oscar H. Heckert3-25-401,000Oscar H. Heckert4-16-40250Oscar H. Heckert4-18-40250*51 On May 7, 1940 the assets and liabilities of Alloy Rods were as follows: AssetsCash$ 192.52Accounts receivable1,724.88Inventory6,305.30Machinery and equipment at cost6,621.40$14,844.10LiabilitiesAccounts payable$ 665.64Cash advances16,500.00$17,165.64 The difference between the amounts of $17,165.64 and $14,844.10 represents a loss from operations prior to May 7, 1940. On May 7, 1940 Alloy Rods Corporation, a Pennsylvania corporation, was organized, having an authorized capital consisting of 1,000 shares of no-par value voting common stock with a stated value of $1 per share and 300 shares of six per cent preferred stock with a par value of $100 per share. (Non-voting common stock was authorized but never issued.) The assets of Alloy Rods were transferred to Alloy Rods Corporation, subject to the assumption by the latter of the liabilities of the former. From the Alloy Rods Corporation's stock certificate books, it appears that its stock was originally issued as follows: Common StockOriginalCertifi-No. ofDate ofDatecate No.SharesIssueIssued in Name ofCancelled115010-8-40Oscar H. Heckert215010-8-40William D. Himes12-24-40340010-8-40Edward J. Brady12-24-40415010-8-40Charles B. Wolf12-24-40*52 Preferred StockOriginalCertifi-No. ofDate ofCertificate Re-cate No.SharesIssueIssued in Name ofCeipted for by12510-8-40Grace T. HimesGrace T. Himes22510-8-40Oscar H. HeckertOscar H. Heckert32510-8-40Mary S. BradyEdward J. Brady4510-8-40Frances G. WolfCharles B. Wolf5510-8-40Frances J. WolfCharles B. Wolf(now McCabe)6510-8-40Jessie C. WolfCharles B. Wolf7510-8-40Mary Julia WolfCharles B. Wolf8510-8-40Charles S. WolfCharles B. Wolf100Alloy Rods Corporation set up the assets and liabilities on its books to indicate: AssetsCash$ 192.52Accounts receivable1,724.88Inventory6,305.30Equipment - at appreciated value(cost to transferors $6,621.40)28,825.00$37,047.70LiabilitiesAccounts payable$ 665.64Debentures16,500.00Preferred stock10,000.00Common stock850.00Paid in surplus9,032.06$37,047.70After the cashing of the following checks drawn on York Trust Company to the payees below indicated, and by the persons and in the amounts indicated, an additional amount of $3,000 was*53 credited by Alloy Rods Corporation to the account "Debentures": Payee -Payee -PayeeAlloy RodsC. B. Wolf forDateAlloy RodsCorporationAlloy RodsGrace T. Himes5- 8-40 $500Grace T. Himes6-26-40500Charles B. Wolf6-28-40 $500O. H. Heckert5- 8-40 $500O. H. Heckert6- 6-40500NOTE: The above entries total $2,500. A payment of $500 made on May 17, 1940, evidently was omitted. The total amount of the "Debentures" account as of December 31, 1940, appears as $19,500. After cashing the following checks, drawn on York Trust Company to the order of Alloy Rods Corporation, or to Alloy Rods, by the individuals in the amounts and on the dates indicated, the amount of $30,000 was credited to the account "Notes Payable." Alloy RodsDateAlloy RodsCorporationO. H. Heckert10-10-40$ 4,975O. H. Heckert10-11-401,990Grace T. Himes10-12-40$5,965Grace T. Himes10-14-401,000O. H. Heckert12-26-4010,000Kate W. Himes, by W. D. Himes, Attorney12-31-406,000(Note)Note: These figures totaling $29,930 were stipulated. Kate W. Himes was the*54 mother of William D. Himes. It appears from the records of Alloy Rods Corporation that additional shares of the unissued preferred stock were issued on December 24, 1940, as follows: OriginalChecks to OrderChecks toCerti-No.of Alloy RodsOrderficateofIssued inCorporationof Alloy RodsCertificate Re-No.ShsName ofDrawn byDrawn byceipted for by935Isabel HeckertOscar H. HeckertOscar H.Heckert$2,0001,5001010Catherine H.MillerWilliam D. HimesWilliam D. Himes$ 7501110Elizabeth H. Wine-William D.Himesbrenner1210William HimesGrace T. HimesWilliam D.Himes$2,750135Laurence T. HimesWilliam D.Himes1410Charles B. WolfCharles B. WolfCharles B. Wolf$1,0002,500155Frances G. WolfCharles B. Wolf165Frances J. WolfCharles B. Wolf175Charles S. WolfCharles B. Wolf185Jessie C. WolfCharles B. Wolf195Mary Julia WolfCharles B. Wolf2095Mary S. BradyEdward J. Brady Isabel Heckert*55 is the wife of Oscar H. Heckert. Catherine H. Miller and Elizabeth H. Winebrenner are the daughters of William D. Himes, and William Himes and Laurence T. Himes are his sons. Frances G. Wolf is the wife of Charles B. Wolf, Charles S. Wolf is his son, and Frances Jane Wolf (now McCabe), Jessie C. Wolf and Mary J. Wolf are his daughters. Mary S. Brady is the wife of Edward J. Brady. It appears from the records of Alloy Rods Corporation that on December 24, 1940, the following cancellations and reissues of its common stock certificates occurred: Cer-tificateNo.NewNo.No. Can-ofCertifi-ofNew CertificatecelledShs.cate No.Shs.Issued in Name ofReceipted for byOscar H.NoNo changeHeckertchangeWilliam D.Himes21505100Wm. D. HimesWm. D. Himes610Grace T. HimesWm. D. Himes710Catherine H. MillerWm. D. Himes810Elizabeth H.WinebrennerWm. D. Himes910William HimesWm. D. Himes1010Laurence T. HimesWm. D. HimesWilliam D.Himes51001115Grace T. HimesNo receipt signed1215Catherine H. MillerNo receipt signed1315Elizabeth H.WinebrennerNo receipt signed1415William HimesNo receipt signed1515Laurence T. HimesNo receipt signed1625William D. HimesNo receipt signedEdward J.Brady340017200Edward J. BradyNo receipt signed18200Mary S. BradyNo receipt signedCharies B.Wolf41501950Charles B. WolfNo receipt signed2050Frances G. WolfNo receipt signed2150Frances Jane WolfNo receipt signed(now McCabe)*56 On December 31, 1940, the assets and liabilities of Alloy Rods Corporation, as entered in its books, were as follows: AssetsCash$ 83.87Accounts receivable53,030.21Inventory29,338.34Machinery and equipment (net of de-preciation including "equipmentwrite-up" of $22,203.60)28,544.00$110,996.42LiabilitiesAccounts payable$ 18,430.43Notes payable30,000.00Debenture notes19,500.00Capital stock: Preferred30,000.00Common850.00Paid-in surplus9,032.06Earned surplus3,183.93$110,996.42 The machinery and equipment consisted of machinery having a cost to its transferors of $6,621.40, but carried on the corporation's books at an appreciated value, as of December 31, 1940, plus machinery purchased in September, 1940, for cash of $2,890.55. Depreciation of $3,171.55 on all such machinery to December 31, 1940, was claimed by the corporation, but only $537.77 of that amount was allowed by the respondent computed on the equipment at cost. On December 31, 1940, Alloy Rods Corporation distributed its assets, in kind, to its common stockholders, of record, in liquidation, subject to its liabilities. The respondent computed*57 a gain on liquidation of Alloy Rods Corporation with respect to its common stock by determining the assets and liabilities to be as follows: AssetsCash$ 83.87Accounts receivable53,030.21Inventories29,338.34Equipment$ 9,511.95Less: Depreciation1,488.978,022.98Good will50,000.00Total assets$140,475.40LiabilitiesAccounts payable$18,430.43Notes payable30,000.00Debenture notes19,500.00Accrued taxes1,468.86Preferred stock30,000.0099,399.29Net worth$ 41,076.11Cost basis of 850 shares of com-mon stock4,178.46Gain on liquidation$ 36,897.65The respondent determined the total cost of the common stock of Alloy Rods Corporation, on the date of incorporation, May 7, 1940, to be $4,178.46, based on the cost value of assets of $14,844.10, less accounts payable of $665.64, as of that date, and less $10,000 of such value attributed to the 100 shares of the preferred stock issued by it on organization. He further determined that the distribution of assets on liquidation, valued at $41,076.11, resulted in a gain on each share of common stock equal to $43.4090, being the difference between*58 the cost of $4.9158 ($4,178.46) / 850 per share, and liquidating value of $48,3248 ($41,076.11) / 850 per share. Taxes were assessed against and paid by the petitioner and William D. Himes upon the gain attributable by the respondent to the liquidation, which gain was computed on their holdings of record of 50 and 25 shares of common stock, respectively, in accordance with the respondent's aforesaid computation. On December 27, 1940, each of the common stockholders of record of Alloy Rods Corporation, entered into an agreement designated as "Articles of Partnership." The agreement provided that the partnership should engage in designing, manufacturing, fabricating, repairing and dealing in all kinds of alloys, welding rods, etc., and in exercising many activities incidental thereto. It limited the term of the partnership to five years and provided for the contribution of non-interest bearing capital, payable in cash or property, in the following proportions: by Edward J. Brady and Mary Shodron Brady, 4/17ths each; by Charles B. Wolf, Frances G. Wolf, and Frances Jane Wolf, 1/17th each; by Catherine H. Miller, Elizabeth H. Winebrenner, William Himes, Laurence T. Himes, Grace T. *59 Himes, and William D. Himes, 1/34th each; and by O. H. Heckert, 3/17ths thereof. The agreement further provided that any payments made by a partner to the partnership or an indebtedness incurred by a partner to it should bear interest and could be made only with the consent of a majority in interest. The partners agreed to aid in the partnership business and not to compete with it. Adequate books and records were to be kept. The salary of Edward J. Brady was fixed at $5,000 per annum. Wolf, Himes, and Heckert were to receive $100 per month and Brady an additional salary of the same amount. Profits credited to the several accounts of the partners could be withdrawn simultaneously by them in proportion to their partnership interests and upon the determination of a majority in interest. At the termination of the partnership, the net assets were to be divided in like proportion. A partner could transfer his share, or a part thereof, to another partner. In the event of the death of a partner, his personal representative had the right to continue as a partner. Other unimportant details were included in the agreement. The assets received by Alloy Rods Company, together with the liabilities*60 assumed by it, which were the same assets and liabilities of Alloy Rods Corporation referred to heretofore were set up on the partnership books as follows: AssetsCash$ 83.87Accounts receivable53,030.21Inventory29,338.34Machinery and equipment28,544.00$110,996.42LiabilitiesAccounts payable$ 18,430.43Notes payable49,500.00Contracts payable30,000.00Accrued taxes894.97Partner's capital12,171.02$110,996.42The account "Notes Payable" assumed as a liability by Alloy Rods Company included the loans to the corporation of $30,000 referred to heretofore, plus the amount of $19,500 appearing in the corporation's account "Debentures" heretofore mentioned. The account "Contracts Payable" represented the entire amount of $30,000 authorized, issued, and outstanding preferred stock of Alloy Rods Corporation. On December 27, 1941, checks were drawn by Alloy Rods Company on York Trust Company to the following named individuals in the amounts indicated: William D. Himes$6,500Oscar H. Heckert6,500Charles B. Wolf6,500 and thereupon the "Notes Payable" account was debited by Alloy Rods Company in the amount of*61 $19,500. This item of $19,500 is the same as that hereinabove mentioned. On January 5, 1942, the following checks were drawn on York Trust Company to the order of Alloy Rods Company by the following individuals in the amounts indicated: William D. Himes$6,500Oscar H. Heckert6,500Charles B. Wolf6,500 and thereupon the "Notes Payable" account was credited by Alloy Rods Company in the amount of $19,500. In computing the amount of taxable net income of Alloy Rods Company for the taxable years involved in these proceedings, the respondent allowed salaries as provided in the "Articles of Partnership." In examining the partnership returns of income of Alloy Rods Company for its fiscal period January 1 to September 30, 1941; its fiscal years ended September 30, 1942 and 1943, and its fiscal period October 1, 1943 to January 31, 1944, the respondent also determined that the original machinery and equipment, acquired by Alloy Rods Corporation upon its organization, and which were included in the assets transferred to Alloy Rods Company, had a basis for depreciation equal to its cost of $6,621.40 depreciated to the date of liquidation. Partly by reason of the adjustment*62 just mentioned, the respondent, in computing the net income of Alloy Rods Company, disallowed the following amounts of depreciation and obsolescence and increased the net income of Alloy Rods Company accordingly, as set forth below: PeriodPeriod 1-1-41Fiscal YearFiscal Year10-10-43to 9-30-4119421943to 1-31-44Depreciation disallowed$1,114.61$1,703.22$1,565.00$602.06Obsolescence disallowed2,000.00The respondent has further determined that Alloy Rods Company did not constitute a bona fide partnership for tax purposes and that the net income of Alloy Rods Company for the taxable years involved in these proceedings is taxable to the individuals and in the ratios as set forth below: Edward J. Brady8/17William D. Himes3/17Oscar H. Heckert3/17Charles B. Wolf3/17On April 28, 1941, Alloy Rods Company filed with the Prothonotary's Office of York County, Pennsylvania, a certificate of registry in accordance with the "Fictitious Name" statute of Pennsylvania. The "Accrued Interest" account of Alloy Rods Corporation shows debits and credits as follows: DebitsDateAmount12-27-40$162.5012-27-40162.5012-27-40162.5012-31-4054.1612-31-4054.1712-31-4054.17Credits10-31-40$487.5012-31-40162.50*63 The "Interest" account of Alloy Rods Corporation shows debits and credits as follows: DebitsDateAmount7-31-40$ 13.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.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.3110-10-4070.0010-31-40487.5010-31-4014.0611-30-40120.0012-31-40162.5012-31-4088.33Credits9-19-40$ 9.9112-31-40 P and L1,013.27The following entries appear in the journal book of Alloy Rods Corporation: Dr.Cr.October 31, 1940 Interest$487.50Interest Accrued$487.50Interest due on notes of $19,500 at 5% May 1to November 1, 1940.December 31, 1940 Interest162.50Interest Accrued162.50Interest due on notes of $19,500 at 5% Novem-ber 1 to December 31, 1940.The following entries appear in the cash disbursements book of Alloy Rods Corporation: December 27, 1940W. D. Himes$162.50O. H. Heckert162.50Charles B. Wolf162.50December 31, 1940Wm. D. Himes54.16O. H. Heckert54.17Charles B. Wolf54.17The original venture (to May 7, 1940) sometimes is designated as Alloy Rods; the Alloy Rods Corporation, as the corporation, and Alloy Rods Company, the partnership, as the company. *64 The record discloses the following additional facts: During the period from 1939 to 1944, inclusive, the petitioner was a partner in the lumber business, conducted under the name of George A. Wolf & Sons; the president of the Mount Wolf Furniture Company, a manufacturer of bedroom furniture; the president of the Standard Concrete Products Company; executive vice president of the Superior Paper Products Company; an officer in the Lumbermen's Merchandising Corporation; president of the school board of Mount Wolf and president of the York Hospital. He carried on the duties of these offices simultaneously. Edward Brady, heretofore mentioned, is a welding engineer. He has been engaged in that profession for about 16 years. Theretofore, he was in the foundry business. He studied engineering at the University of Illinois and the Armour Institute in Chicago. He came to York, Pennsylvania, on January 1, 1939, to take charge of the stainless welding electrode department of the Mackay Company. About September 1, 1939, Brady stated to the petitioner that if he had sufficient funds he could make a large amount of money. The petitioner suggested that Brady discuss the matter at the petitioner's*65 office. The petitioner brought Himes and Heckert to the conference. After several weeks of discussion, the petitioner, Himes and Heckert decided to provide the money for the proposed venture. At first the business was very loosely and informally conducted. During the early stages of the enterprise, the petitioner was often out of town. Under such circumstances, Heckert or Himes, or both, furnished the money needed to purchase various articles of equipment. By agreement, the individual who paid for such equipment would be reimbursed by the others in proportion to their shares. At various times Heckert made advances to Alloy Rods for the petitioner's own benefit. In October, 1939, Heckert so advanced $3,000 and was later repaid by the petitioner. By other direct payments to the business amounting to $1,500; his share of an advance for machinery ($433.33); reimbursements to Heckert of $516.67 and cash of $50, the petitioner furnished a capital investment of $5,500. On May 17, 1940, the petitioner also paid, through Himes' secretary, an $500additional to the capital of the corporation for the benefit of his daughter, Frances J. Wolf, and on June 28, 1940, a further sum of $500 for his*66 wife, Frances G. Wolf, under circumstances hereinafter set forth, the funds being furnished by the daughter and the wife. Capital was an important and necessary factor in the business of the corporation and the successor partnership. The petitioner's daughter, Frances J. Wolf, a William and Mary student, was much interested in purchasing a fur coat. Her grandmother had given her the money to buy it. The coat was in a store in Richmond, Virginia, but when she returned to Richmond the coat had been sold. Thereupon, after a full explanation by petitioner of the risk involved, Frances J. Wolf instructed her father to invest the $500 in the corporation. She became of age on March 21, 1940. Subsequently, with similar knowledge of the enterprise, the petitioner's wife, Frances G. Wolf, directed him to make a like capital investment of the same amount. The petitioner was reimbursed by his wife by a check dated November 27, 1940, for $150; by $175 in cash on November 27, 1940 and by withdrawal of $175 from her savings account on November 29, 1940. These repayments were from her sole and separate property. The petitioner did not agree to reimburse either his daughter or his wife in case of*67 a loss of their investments nor was there an understanding that the funds so contributed by them were loans or gifts from the petitioner. After the petitioner had invested the funds of his wife and his daughter he told them that he would share his stock interest therein on an equal basis, that is, one-third to each. It had been his life-long practice to make such arrangements with them. Consequently, the shares were so re-issued as above set forth. Petitioner attached no conditions or limitations to the ownership of the shares and to the extent that the stock of the corporation, issued to petitioner's wife and daughter on December 24, 1940, represented capital of the corporation in addition to that actually contributed by the wife and daughter, the stock thus issued constituted a complete and irrevocable gift made by the petitioner in an attempt to "vest full, complete and irrevocable legal ownership of said stock" in the petitioner's wife and daughter, who thereupon became the owners of the shares covered by the certificates issued to them. Mrs. Wolf had an estate in excess of $10,000 and their daughter an estate of about half that amount. These estates had been accumulated by*68 dividends from their securities and by inheritances from the petitioner's father received in 1934. The petitioner acted for them in signing for and receiving the stock certificates, as had been their custom in the management of their financial affairs, but they had actual control of the income and the purpose for which it was used. Distributions made from the company to Mrs. Wolf and Frances J. Wolf were used by them as they saw fit without limitation whatsoever by the petitioner. Creditors of the company investigated the status of all partners, including Frances G. Wolf and Frances J. Wolf, and the personal estates of the several children in the partnership were relied upon by creditors. On the liquidation of the corporation, the petitioner's wife and daughter were assessed deficiencies on the capital gain arising therefrom, on the basis heretofore set forth, and they paid such assessments personally. The sum of $16,500 (increased to $19,500 by additional contributions of $1,000 each by Grace T. Himes, Heckret and the Wolf family made in May and June, 1940) was variously described as debentures, cash payments, notes payable, debenture notes, etc., and represented and was considered*69 to be the permanent capital of the corporation. The Wolf, Himes and Heckert interests each contributed $5,500 (later increased to $6,500). The notes were issued, pursuant to a suggestion made by Heckert, in order to protect those who had invested money, in case the enterprise were unsuccessful and the corporation were forced to liquidate. Since Brady contributed only his skill and services but received almost half the stock, the stockholders felt that his interest, upon liquidation, should be subordinate to that of the other stockholders. The capital of the Himes, Wolf and Heckert interests was also represented by 850 shares of common stock and 100 shares of preferred stock of the corporation. In view of the credit status of the corporation, the requirement for personal guarantee (supplied by only a part of the stockholders) and the enactment of the Federal corporation excess profits tax statute in 1940 the stockholders deemed it advisable to liquidate the corporation as of December 31, 1940. Thereupon, on that date, the corporation distributed its assets in kind, subject to its liabilities, to its common stockholders in proportion to their stockholdings, in complete liquidation, *70 as above stated. On December 27, 1940, the signators to the Articles of Partnership were all over 21 years of age. The checks of the company for $6,500 each, dated December 27, 1941, payable to petitioner; Himes, and Heckert, respectively, were issued in order to avoid the technical operation of the Pennsylvania corporate loans and personal property tax statutes which imposed a tax of four mills on loans. The repayment of the same respective amount on January 5, 1942, was made for the purpose of continuing the $19,500 as permanent capital of the partnership. The partnership, known as Alloy Rods Company, was a bona fide, real and valid partnership and the income from only the petitioner's 1/17th share therein is taxable to him. The Commissioner added to the petitioner's income for the year 1941 the sum of $5,500 as "Liquidation of Notes" with the following comment: "The debenture notes in the amount of $5,500.00 held by you in the predecessor Alloy Rods Corporation, which debenture notes were assumed as notes payable' by the alleged partnership of Alloy Rods Company, had no cost basis in your hands. Therefore, the total amount of $5,500.00 paid to you by Alloy Rods Company*71 in the year 1941, in liquidation of the foregoing notes payable', is includible in your taxable income forthe year 1941." During the year 1944, the petitioner's two daughters, Jessie C. Wolf, aged 18 or 19, and Mary Julia Wolf, aged 13, lived with him as members of his household. The petitioner supplied their entire support during that year. During the year each daughter received income of less than $500 which she deposited in a savings account. In his income tax return for 1944 the petitioner claimed surtax exemptions for both daughters. In his notice of deficiency the respondent disallowed one surtax exemption with no explanation. The petitioner is entitled to surtax exemptions for both daughters under the provisions of section 25 (b), I.R.C., as amended by section 10 (b) of the Revenue Act of 1944. The petitioner first met J. Ross Grove in the fall of 1910 when both were employees of the Standard Chain Company. At the time, Grove was planning to develop a coinoperated gasoline vending pump. He discussed the proposed invention with the petitioner until the early 1920s when the petitioner advanced money to finance the venture. At that time Grove was well*72 over 70 years of age. He and Grove entered into an agreement providing that Grove would complete the invention, that the petitioner would supply the needed funds and that they would share equally in the profits. The petitioner continued to furnish such advances until 1928 or 1929 when Grove became ill. His health was such that he could not continue the promotion of the invention on which a patent had been issued but which required further improvement. The petitioner advanced a total amount of $5,200 "and some odd cents" for Grove's expenses, machinery and patent attorney fees. Nothing was done on the gasoline vending pump invention between 1928 or 1929 and 1941 when Grove died, at over 90 years of age. He was insolvent at the time of his death. The petitioner and Grove's attorney paid Grove's funeral expenses. The attorney, as administrator of Grove's estate, informed the petitioner that there was nothing in the estate. In his return for 1941 the petitioner claimed a deduction of $5,200.58 as a bad debt. In his notice of deficiency the respondent disallowed the deduction with no explanatory comment. The petitioner is not entitled to a deduction in the year 1941 for the amount of*73 his advances to Grove, either as a bad debt, or on the ground that the transaction was entered into for profit. Opinion VAN FOSSAN, Judge: The first issue presents the problem of family partnership. Although the stipulated facts, supplemented by oral testimony, are somewhat complicated and confused, the basic issue is simple, - was the petitioner taxable on 3/17ths of the income earned by the partnership in which the petitioner, his wife and his daughter were, purportedly, all members, each owning a 1/17th share therein, or was he the owner of only 1/17th of such income and so taxable? The petitioner invested an initial capital of $5,500 in the welding rod venture, then being carried on as a partnership. On May 17, 1940 and June 28, 1940, respectively, his wife and his daughter, through him, invested $500 each in the same enterprise, then being operated as a corporation. The genesis of each contribution of capital is fully set forth in the facts. The capital payments were from funds owned and controlled by the wife and the daughter and originated from sources other than the petitioner. After the investments were made by the wife and daughter the petitioner stated that he would*74 follow a long-established custom by sharing his investment equally with them. Accordingly, common stock of the corporation was reissued in the amounts of 50 shares to each to reflect such intent and purpose. In the subsequent liquidation the assets were distributed to all stockholders of record and the petitioner paid a tax on the gain attributed by the respondent to his 50 shares, or 1/17th interest. His wife and his daughter likewise were assessed and paid a capital gain tax on the 50 shares, or 1/17th interest, belonging to each of them. Subsequently, upon the formation of the partnership, petitioner, his wife and his daughter each contributed an equal amount of assets and each received therefor a 1/17th interest in the partnership. The original investments made in the corporation by the petitioner's wife and daughter were from their own funds and thus it is clear that each of them had a partnership interest in the company in some amount. Obviously, the petitioner is not taxable on the full 3/17ths interest, as determined by the respondent. The only issue on this phase of the case remaining, therefore, is whether the income from the partnership interests owned by the Wolf family*75 should be divided equally among the three partners according to the partnership agreement or in the proportion of the amounts originally invested by each of them, i.e., $5,500, $500, and $500, respectively. The recent opinion of the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, (decided June 27, 1949) contains much comment particularly pertinent to the case at bar. The vital point is the determination of whether or not "the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits or losses or both," as originally stated in Commissioner v. Tower, 327 U.S. 280. In elaborating and amplifying the principles set forth in the Tower case, the Court said: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, *76 the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. There is nothing new or particularly difficult about such a test. * * *" The record in the case at bar contains conclusive evidence that the partners constituting the company "joined together in good faith to conduct a business, having agreed that the services or capital to be contributed presently by each was of such value to the partnership that the contributor should participate in the distribution of profits", found in the Culbertson case to be sufficient to establish a partnership within the tax law. The division of Wolf's interest in the corporation is subject to the same rules of definition and interpretation. Here the petitioner, his wife and his daughter not only became shareholders in the company but by agreement among themselves they became equal owners therein. The differing amounts contributed by each did not deter respondent in determining the taxable gain on the corporate liquidation. He taxed them according to their*77 ownership of the shares, as determined by them. As the Supreme Court said, "the Tower case does not purport to authorize the Tax Court to substitute its judgment for that of the parties." Since the petitioner, his wife and his daughter agreed to share their interests equally instead of in proportion to the capital contributed by each, it is not for us to say that they exercised poor judgment or that the reasons for their action were inadequate and thus to "substitute our judgment for that of the parties." Here the division of the petitioner's holdings was made following the capital contributions of his wife and his daughter in the corporation. The donations made by the petitioner and the respective shares resulting therefrom were contributed to the business when the partnership was formed. In our judgment, the factual background, together with the conduct of the parties subsequent to the division of the petitioner's interest, the control, use and enjoyment of the income therefrom by the wife and daughter, the subsequent contribution of capital to the partnership, and other pertinent facts, all lead to the conclusion that the parties in good faith, and acting with a business purpose, *78 intended to and did join in the present conduct of the enterprise, with equal shares therein. They should be taxed accordingly. See Edward A. Theurkauf, 13 T.C. - No. 70 (October 7, 1949). Therefore, the petitioner is taxable only on a 1/17th interest in the income received from the partnership, the Alloy Rods Company, during the taxable years. The second issue presents the proper basis for depreciation of the machinery and equipment owned by the corporation, acquired from it by the stockholders upon the liquidation of the corporation and transferred by them to the company. The respondent used the original cost, $6,621.40, as the unadjusted basis. The petitioner claims a fair market value of the property, purchased at a cost of $6,621.40, to have been $28,825 on December 31, 1940, based on replacement cost. In the alternative, the petitioner asks a value of $14,125, representing the alleged replacement value of the machinery at market prices on May 7, 1940 for used machinery. The petitioner presented Brady as a witness to the fair market value of the equipment and machinery on May 7, 1940, the date of acquisition by the corporation. The respondent challenges his competency as*79 an expert appraiser and argues that values founded on his own personal opinion were "guess work." It is at once apparent that the cost of new machinery is not a proper basis for determining fair market value. It is also clear that the petitioner produced no testimony as to the fair market value of the machinery on December 31, 1940, the critical date. Brady testified that he purchased the machinery between September 9, 1939 and January 1, 1940, and that no reappraisal was made as of December 31, 1940. Assuming that the property had the same value on May 7, 1940, as on January 1, 1940, it does not follow that the same value persisted to December 31, 1940. The petitioner's failure to show the fair market value on December 31, 1940, is fatal to his contention. Much could have happened to the equipment between May 7, 1940 and December 31, 1940. Therefore, the respondent's action in using the original cost figure of $6,621.40 as the basis of depreciation is approved. In the third issue the petitioner contends that the contributions made by Grace T. Himes, Heckert and the Wolf interests constituted a capital investment in the venture and carried through the corporation to the partnership, *80 the form in which the business is now being operated, and that the $16,500 alleged to have been "paid" in 1941 was merely a transfer of vouchers in order to avoid the payment of the Pennsylvania personal property tax on corporate "loans." Obviously, if the funds represented capital and the notes were mere security, as contended by petitioner, there would be no purpose in the maneuver by which the partnership attempted to dodge the Pennsylvania personal property tax. The book entries of the corporation are inconsistent with the petitioner's contention and he has not satisfactorily demonstrated either in the record or on brief that respondent erred in taxing the payments. The fourth issue involves the right of the petitioner to surtax credits for the year 1944 based on the dependencies of his two daughters, Jessie C. Wolf and Mary Julia Wolf, under the provisions of section 25 (b), I.R.C., as amended by the Revenue Act of 1944. 1 The facts of record fully support the petitioner's claim. Each daughter depended on her father for her entire support. Each had a small income, under $500 a year, which she deposited in a savings account. We have found as a fact that*81 the petitioner is entitled to the allowance of surtax credits for both daughters and we so hold. The fifth and final issue raises the question of the deductibility of $5,200.58 in the year 1941 asked by the petitioner as either a bad debt deduction or a loss on a transaction entered into for profit. The petitioner does not abandon unequivocally his theory that a debt was created by his advances to Grove but states his position as follows: "Petitioner contends, however, that the obvious and true nature of*82 the transaction was the investment, by Wolf, of capital, to be joined with the services and inventive genius of Grove, in a project, the profits of which, it was intended, should be shared equally. In effect, therefore, there was a joint venture in the character of a transaction entered into by Wolf and Grove, for profit. * * *" The respondent contends that the loss, if any, was sustained prior to 1941. We agree with his contention. The evidence purporting to prove the fact that the petitioner made an investment of "a little over $5,200" is sketchy and uncertain. Assuming, however, that it is sufficient to support the finding that the petitioner made such an investment and sustained a loss by reason of his inability to obtain the repayment of all or any part thereof, the record falls far short of establishing that the loss occurred in 1941. Grove was a man well over 70 years of age when the petitioner first advanced money to finance the invention and the manufacture of the gasoline vending machine. He worked on the invention and the petitioner made similar advances until 1928 or 1929 when Grove became ill. From that time to the date of his death he was unable to do any further promotion*83 work thereon. A patent had been issued on the device but further improvement was needed to make it efficient. From 1929 to 1941 the entire project was dormant. The petitioner submitted no evidence showing any value whatever of either the patent rights or the invention itself during that period. He asks us to assume that the asset was "potentially valuable" until Grove died and that his death marked the petitioner's determination of his loss. We do not so read the record. The petitioner advanced his entire investement before the end of 1929. For 12 years thereafter, Grove's ill health prevented any attempt to make the invention workable. The petitioner knew this situation throughly. In view of Grove's advanced age and poor health the petitioner had no reason to believe that he could recover any part of his investment. Grove's death in 1941, at over 90 years of age, did not affect the conclusion which the petitioner had formed many years prior to 1941, that there was no present or expectant value to the invention. In 1929 or 1930 the petitioner testified that he wanted to charge the item off. He consulted an employee of the collector of internal revenue's office at York but was told*84 that he could not do so until Grove died. The petitioner's testimony shows that many years before 1941 he realized that he had sustained a loss of his investment. The opinion of the internal revenue employee is no ground for allowing the deduction in the year 1941. The respondent's action is approved. The petitioner has conceded that the respondent correctly adjusted certain renegotiation credits for the years 1943 and 1944 and due consideration will be given thereto in the recomputation of his income tax under Rule 50. Decisions will be entered under Rule 50. Footnotes*. Certain mathematical or typographical errors exist in the stipulation. If found to be material, they may be corrected by the parties in their computation.↩1. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. (b) Credits for Surtax Only. (1) Credits - There shall be allowed for the purpose of the surtax, but not for the normal tax, the following credits against net income: * * *(C) A surtax exemption of $500 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, * * *(3) Definition of Dependent. - * * * the term "dependent" means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer: (A) a son or daughter of the taxpayer. * * *↩